# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Statesville Division

UNITED STATES OF AMERICA,

    v.

GREG E. LINDBERG, *et al.*,

        *Defendants.*

No. 5:19-cr-22-MOC

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT GREG LINDBERG'S MOTION FOR JUDGMENT OF ACQUITTAL OR, ALTERNATIVELY, FOR A NEW TRIAL

Robert T. Smith (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
202-625-3500
robert.smith1@katten.com

James F. Wyatt, III
  (NC State Bar No. 13766)
Robert A. Blake, Jr.
  (NC State Bar No. 20858)
WYATT & BLAKE, LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
704-331-0767
704-331-0773 (fax)
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Brandon N. McCarthy (*pro hac vice*)
Rachel M. Riley (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201-2591
214-765-3600
brandon.mccarthy@katten.com
rachel.riley@katten.com

*Counsel for Defendant Greg E. Lindberg*

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Background ......................................................................................................... 1

Argument ............................................................................................................ 4

I.      The government introduced insufficient evidence of a prohibited *quo*,
        warranting a judgment of acquittal on both counts .......................................... 6

        A.      The reassignment of tasks and the internal movement of
                personnel, without more, do not qualify as an "official act." ................ 8

        B.      The reassignment of tasks and the internal movement of
                personnel do not qualify as the "business" or a "transaction" of the
                North Carolina Department of Insurance ............................................... 14

        C.      To the extent there is a distinction between task reassignment
                and moving personnel, a new trial is warranted because the Court
                declined to instruct the jury it could not convict on the former .......... 18

II.     A new trial is warranted based on instructional and evidentiary errors ....... 21

        A.      The Court gave incorrect instructions on the requisite level of
                intent and improperly lowered the government's burden on both
                counts .................................................................................................... 21

                1.      Counts One and Two required "corrupt" intent ........................ 23

                2.      The Court improperly instructed the jury that, as to both
                        counts, "the government is not required to prove that the
                        defendant knew beyond all reasonable doubt that his acts
                        were unlawful." .......................................................................... 25

                3.      These errors were not harmless ................................................. 26

        B.      The Court erred by declining to admit evidence of two State
                statutes, which tended to show that the Defendants did not
                request an "official act" or anything that could be characterized
                as the "business" of the Department of Insurance ............................... 27

                1.      The statutes were plainly relevant to whether the
                        Defendants requested a prohibited *quo* ..................................... 27

2.    The Court's relevancy determination was incomplete, which in turn infected its balancing inquiry under Rule 403 of the Federal Rules of Evidence .................................... 30

3.    The error was not harmless ...................................... 33

C.    The Court erred in failing to instruct the jury on alternative methods for evaluating the $5,000-value element under Count Two ................................................................................. 34

1.    The Court erred in declining to provide Mr. Lindberg's alternative methodology for valuing the subject matter of the alleged bribe ......................................................... 35

2.    The Court's stated basis for declining to add the Defense's alternative valuation method misapprehended the Fourth Circuit's prior decision in this case .............................. 38

3.    The error was not harmless ...................................... 40

D.    The Court erred by admitting two e-mails containing an evolving list of to-do items and notes that Mr. Lindberg maintained that had no additional probative value and posed a substantial risk of unfair prejudice ...................................................... 41

1.    The e-mails were of limited to no probative value and posed a substantial risk of unfair prejudice ......................... 41

2.    The error was not harmless ...................................... 47

Conclusion ............................................................................... 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buckley v. Valeo,*
   424 U.S. 1 (1976) (per curiam) ................................................................. 18

*Carnell Constr. Corp. v. Danville Redev. & Housing Auth.,*
   745 F.3d 703 (4th Cir. 2014) .................................................................... 43

*Citizens United v. Fed. Election Comm'n,*
   130 S. Ct. 876 (2010) ............................................................................... 24

*F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.,*
   184 F.R.D. 64 (D. Md. 1998) .................................................................. 45

*McCutcheon v. Fed. Election Comm'n,*
   572 U.S. 185 (2014) ................................................................................. 12

*McDonnell v. United States,*
   136 S. Ct. 2355 (2016) .....................................................................*passim*

*Old Chief v. United States,*
   519 U.S. 172 (1997) ................................................................................. 33

*Santrade, LTD. v. General Electric Co.,*
   150 F.R.D. 539 (E.D.N.C. 1993) ............................................................ 45

*Skilling v. United States,*
   561 U.S. 358 (2010) ................................................................................. 23

*Sorich v. United States,*
   129 S. Ct. 1308 (2009) (Scalia, J., dissenting from denial of cert.) ....................... 13

*Swajian v. Gen. Motors Corp.,*
   916 F.2d 31 (1st Cir. 1990) ..................................................................... 32

*United States v. Bell,*
   901 F.3d 455 (4th Cir. 2018) .................................................................. 32

*United States v. Bonner,*
   648 F.3d 209 (4th Cir. 2011) .................................................................... 5

*United States v. Brizuela,*
   962 F.3d 784 (4th Cir. 2020) .................................................................. 26

*United States v. Burgos,*
   94 F.3d 849 (4th Cir. 1996) ................................................................. 5

*United States v. ChevronTexaco Corp.,*
   241 F. Supp. 2d 1065 (N.D. Cal. 2002) ................................................ 45

*United States v. Fearn,*
   589 F.2d 1316 (7th Cir. 1978) ............................................................. 5

*United States v. Foley,*
   73 F.3d 484 (2d Cir. 1996) ............................................................. 35, 37

*United States v. Griffin,*
   684 F.3d 691 (7th Cir. 2012) ............................................................... 5

*United States v. Ham,*
   998 F.2d 1247 (4th Cir. 1993) ......................................................... 32, 44

*United States v. Lewis,*
   53 F.3d 29 (4th Cir. 1995) ................................................................ 34

*United States v. Lindberg,*
   39 F.4th 151 (4th Cir. 2022) ......................................................*passim*

*United States v. Lis,*
   120 F.3d 28 (4th Cir. 1997) ................................................................ 6

*United States v. Passaro,*
   577 F.3d 207 (4th Cir. 2009) ............................................................. 34

*United States v. Santopietro,*
   166 F.3d 88 (2d Cir. 1999) ............................................................... 35

*United States v. Socony-Vacuum Oil Co.,*
   310 U.S. 150 (1940) ....................................................................... 46

*United States v. Stapleton,*
   730 F. Supp. 1375 (W.D. Va. 1990) ..................................................... 6

*United States v. Tillmon,*
   954 F.3d 628 (4th Cir. 2019) ............................................................. 35

*United States v. White Eagle,*
   721 F.3d 1108 (9th Cir. 2013) ........................................................... 35

## Statutes

18 U.S.C. § 201 ................................................................................ 23, 25

18 U.S.C. § 641 ...................................................................................... 36

18 U.S.C. § 666 ................................................................................ *passim*

18 U.S.C. § 1343 ...................................................................................... 3

18 U.S.C. § 1346 ...................................................................................... 3

18 U.S.C. § 1349 ...................................................................................... 3

41 U.S.C. § 52(2) .................................................................................... 23

N.C. Gen. Stat. § 58-2-1 ..................................................................... 7, 15

N.C. Gen. Stat. § 58-2-25(a) .................................................................. 16

N.C. Gen. Stat. § 58-2-45 ................................................... 12, 27, 30, 33

N.C. Gen. Stat. § 58-2-132 ........................................................... 27, 30

## Rules

Fed. R. Crim. P. 29(a) .......................................................................... 4, 5

Fed. R. Crim. P. 33 .................................................................................. 6

Fed. R. Evid. 201 ................................................................................... 28

Fed. R. Evid. 401 ................................................................................... 28

Fed. R. Evid. 403 ........................................................................... 30, 32

Fed. R. Evid. 803(6), (8) ...................................................................... 28

Fed. R. Evid. 902(5) .............................................................................. 28

## Other Authorities

N.C. Const., art. III, secs. 7(1) & 11 .................................................... 16

Kristine Phillips & Eli Rosenberg, *Susan Collins calls donations to her
    opponent a 'classic quid pro quo' to extort her*, Wash. Post, Oct. 8,
    2018, *available at* https://tinyurl.com/thvkn2y6 .................................. 24

Eli Rosenberg, *Collins blasted 'dark money' groups in Kavanaugh fight. One just paid to thank her for her vote*, Wash. Post, Oct. 12, 2018, *available at* https://tinyurl.com/5af8sh4w .......................................................... 24

Ramon Antonio Vargas, *John Oliver offers to pay Clarence Thomas $1m a year if he resigns from supreme court*, The Guardian, Feb. 19, 2024, *available at* https://tinyurl.com/2dhtfk2v .................................................... 24

Natalie Venegas, *Did John John Oliver Break Law Offering Clarence Thomas $1M to Retire?*, Newsweek, Feb. 20, 2024, *available at* https://tinyurl.com/36k7mp9x ................................................................ 24

## INTRODUCTION

Defendant Greg Lindberg respectfully submits this memorandum of law in support of his motion for a judgment of acquittal or, alternatively, for a new trial. As explained below, Mr. Lindberg is entitled to a judgment of acquittal on both counts. Neither the reassignment of tasks nor the internal movement of personnel qualifies as an "official act," rendering the evidence insufficient to sustain the Defendants' convictions for conspiracy to commit honest-services wire fraud (Count 1). Nor does a request for a different regulator qualify under 18 U.S.C. § 666(a)(2) as "the business" or a "transaction" of the Department of Insurance, which renders invalid the Defendants' convictions for federal-program bribery (Count 2). In the alternative, Mr. Lindberg respectfully requests a new trial based on errors in the Court's jury instructions and evidentiary rulings that justify such relief.

## BACKGROUND

Greg Lindberg owns insurance businesses subject to regulation in North Carolina. In early 2018, Mr. Lindberg and one of his consultants, John Gray, complained to Michael Causey, the elected Commissioner of Insurance, about perceived biases and other issues associated with Jacqueline Obusek, the senior deputy commissioner who had been assigned to review Mr. Lindberg's businesses. In response, the Commissioner offered to reassign oversight of Mr. Lindberg's businesses to a different deputy, but only if Mr. Lindberg agreed to provide a campaign contribution. Mr. Lindberg ultimately agreed to make contributions benefitting Commissioner Causey's campaign through an independent expenditure committee and the North Carolina Republican Party, both of which Mr. Gray helped

1

arrange. As it turns out, the Commissioner had solicited the contributions at the behest of the Federal Bureau of Investigation.

Critically, no one—neither Mr. Lindberg nor anyone else—sought a particular outcome on the Department's oversight of Mr. Lindberg's businesses. To the contrary, the FBI recorded Mr. Lindberg telling Commissioner Causey that he had no problem with "thorough" and "rigorous" regulation. GEL Exh. 192, at 32:24-25. Mr. Lindberg explained instead that he believed Ms. Obusek had preconceived biases against his companies. GEL Exh. 158, at 18:14-19:10.

In a meeting in March 2018, after claiming that he would "get pushback" for reassigning work within the Department, Commissioner Causey asked: "[W]hat's in it for me?" GEL Exh. 164, at 53:1, 54:2. In response, Mr. Lindberg said he wanted Commissioner Causey "to be the commissioner that creates the best industry in this state," and he would "do whatever it takes" to support his "re-election." *Id.* at 54:9-11. Mr. Lindberg then said he could do "a number of things" to support Commissioner Causey, such as targeting "a goal of raising two million or something like that," or that Mr. Lindberg could "put in a million or two" into an independent expenditure committee, but that Mr. Lindberg was "just brainstorming" and "thinking out loud." *Id.* at 54:15, 55:13-21.

Commissioner Causey tied his demands for campaign contributions to reassigning oversight of Mr. Lindberg's companies to Ms. Walker. He told Mr. Lindberg and Mr. Gray that once he had "money in the bank," he would "go forward" with the reassignment. GEL Exh. 192, at 20:15-17. Commissioner Causey also

pressed Mr. Lindberg for a payment to his personal checking account. GEL Exh. 195, at 10:21-11:6. In response, Mr. Lindberg and Mr. Gray questioned the legality of such a contribution, *id.* at 11:7-12, and Commissioner Causey's solicitation went nowhere. Rather, Mr. Lindberg emphasized that he was prepared to make only campaign contributions, and only within "the bounds of North Carolina election law." *Id.* at 37:16-17. Ultimately, Mr. Lindberg made contributions to an independent expenditure committee and the North Carolina Republican Party. Gov't Exhs. 19A, 19B & 46.

In the end, there was no evidence that Mr. Lindberg's campaign contributions were tied to an outcome on any regulatory matter. *E.g.*, Day 3 Rough Tr. 52:13-22; *see also* Day 6 Rough Tr. 23:8-24:20. Mr. Lindberg emphasized that he was simply asking the Department to treat all parties on "an even playing field." GEL Exh. 195, at 19:4-11. And Mr. Gray noted that they were not looking for a pass, explaining that if the Department ever found a "problem" with compliance, Mr. Lindberg's companies would "address it." *Id.* at 18:7-9. Commissioner Causey, for his part, admitted that Mr. Lindberg said repeatedly that he only wanted "robust regulation, and he's happy to be well regulated," and that regulation would be "tough and fair, and he's fine with that." Day 3 Rough Tr. 111:16-18, 127:22-24.

A grand jury indicted Mr. Lindberg and Mr. Gray on two counts: (1) conspiracy to commit honest-services wire fraud under 18 U.S.C. §§ 1343, 1346, 1349, and (2) federal-program bribery under 18 U.S.C. § 666(a)(2). *See* Indictment, Dkt. No. 3.

During an initial trial, the jury found Mr. Lindberg and Mr. Gray guilty on both counts. But the Fourth Circuit vacated the convictions, holding that an "official act"—a required element of conspiracy to commit honest-services wire fraud—is a matter for the jury to resolve, and that this warranted a re-trial on both counts. *United States v. Lindberg*, 39 F.4th 151, 159-65 (4th Cir. 2022). In the process, the Fourth Circuit clarified the business-or-transaction element under § 666(a)(2)—most notably, that the "business" at issue does "not" involve "the business *of the agent* receiving the bribe but, rather, the business *of the entity* on whose behalf the agent is authorized to act." *Id.* at 174 (emphasis in original). As a result, the Fourth Circuit vacated this Court's prior judgment and remanded for a new trial. *Id.* at 175-76.

On retrial, Mr. Lindberg and Mr. Gray focused their defense on a lack of criminal intent and the absence of any request for a prohibited *quo*—that is, what they requested, the reassignment of work from one deputy to another, did not amount to an "official act" or the "business" of the Department of Insurance with a value of $5,000 or more. The jury returned verdicts of guilty on both counts against both Defendants. Still, the Court noted that the case was vigorously litigated by both sides, and even after the jury's verdict, the Court stated its belief that the jury could have gone "either way." Day 7 Rough Tr. 128:7-8.

## ARGUMENT

Rule 29 of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion *must* enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a) (emphasis

added). On such a motion, a court inquires as to whether the evidence adduced at the close of the government's case would allow "a rational trier of fact" to "have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011) (quotation marks omitted). In conducting this inquiry, the Court does not weigh evidence or make credibility determinations, and it must "view the evidence in the light most favorable to the prosecution." *Id.* But even under this standard, the government is not relieved of its obligation to supply "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*

On a Rule 29 motion, a court also must guard against a conviction that is based on evidence "so scant that the jury could only speculate as to the defendant's guilt, and is such that a reasonably-minded jury must have a reasonable doubt as to the defendant's guilt." *United States v. Fearn*, 589 F.2d 1316, 1321 (7th Cir. 1978) (citation omitted); *accord Bonner*, 648 F.3d at 214 (explaining that, while a court is required to view "conflicting evidence and credibility" in the government's favor, it is "impermissible" to allow "juries to invent new evidence based on unsubstantiated" speculation). For this reason, the Seventh Circuit has explained: "A jury cannot speculate its way out of reasonable doubt." *United States v. Griffin*, 684 F.3d 691, 698-99 (7th Cir. 2012) (quotation marks omitted); *see also United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (requiring "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt").

If the Court denies a motion for judgment of acquittal, it may nonetheless "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Various circumstances satisfy this standard. Among other things, a court may order a new trial where a defendant was unduly harmed or his trial was made unfair by the erroneous admission or exclusion of evidence. *United States v. Lis*, 120 F.3d 28, 29 (4th Cir. 1997); *United States v. Stapleton*, 730 F. Supp. 1375, 1380 (W.D. Va. 1990) (ordering a new trial when the admission of evidence was "improper" and "unfairly prejudiced" the defendant). In addition, an improper jury instruction may also justify a new trial. *McDonnell v. United States*, 136 S. Ct. 2355, 2375 (2016).

## I.    The government introduced insufficient evidence of a prohibited *quo*, warranting a judgment of acquittal on both counts.

In this case, the government has stretched the federal bribery statutes beyond their breaking point. Whereas in other cases, the government has set out to prove a request for some kind of favorable action that advances the merits of something like a lawsuit before a court, hearing before a legislative committee, or determination before an administrative agency, the government proved none of those things here. Instead, it has taken the position that the mere reassignment of work from one deputy commissioner to another—without any proof Mr. Lindberg sought a different outcome on the Department of Insurance's review of his businesses—qualifies as an "official act" or the "business" of the Department. The government is badly mistaken.

As explained below and during Mr. Lindberg's oral motions for a judgment of acquittal, neither the reassignment of tasks nor the internal movement of personnel qualifies as an "official act," which is necessary to sustain the Defendants' convictions

6

for conspiracy to commit honest-services wire fraud (Count 1). Day 6 Rough Tr. 8:14-18; 48:14-15. A contrary view raises serious constitutional issues that the Supreme Court already resolved against the government in *McDonnell*.

Nor does a request for a different regulator qualify under 18 U.S.C. § 666(a)(2) as the "business" or a "transaction" of the Department of Insurance (Count 2). *See* Day 6 Rough Tr. 8:24-9:4; 48:14-15. As the Fourth Circuit explained, "the business at issue is not the business *of the agent* receiving the bribe but, rather, the business *of the entity* on whose behalf the agent is authorized to act," which "will naturally vary according to the purpose and operations of the covered entity." *Lindberg*, 39 F.4th at 174 (emphasis in original). Here, the Department of Insurance is "charged with the *execution* of laws relating to insurance." N.C. Gen. Stat. § 58-2-1 (emphasis added). The purely *internal* matter of *who* performs a particular task on *behalf of the* Department may be the business of Michael Causey, the Insurance Commissioner. But the change from one deputy commissioner to another does not, without more, bear on the business of the Department of Insurance, which is focused on the *external* regulation of insurance companies, brokers, and agents. And here, there was no evidence the Defendants asked Commissioner Causey to alter the way the Department of Insurance was enforcing the insurance laws against Mr. Lindberg's companies. Indeed, the government conceded there was "no evidence" the deputy

commissioner the Defendants requested, Debra Walker, "was corrupt or had some sort of side deal" with the Defendants." Day 7 Rough Tr. 19:10-11 (Gov't Closing).*

As a result, the government has not submitted sufficient evidence that the Defendants requested a prohibited *quo* under the honest-services wire fraud statute or Section 666. Mr. Lindberg's convictions must be set aside on both counts.

At a minimum, though, to the extent this Court perceives a distinction between the reassignment of tasks, on one hand, and the internal movement of personnel, on the other, a new trial would be warranted. Mr. Lindberg specifically requested an instruction that the reassignment of tasks does not qualify as an "official act" or the "business" of the Department. *See* Day 5 Rough Tr. 39:15-40:16, 65:1-4; *see also* Dkt. No. 433, at 4, 12. Because the jury was permitted to find guilt on a ground that is without question impermissible, it is possible the jury convicted Mr. Lindberg "for conduct that is not unlawful." *McDonnell*, 136 S. Ct. at 2375. Thus, at a minimum, the Court should order new trial.

### A.  The reassignment of tasks and the internal movement of personnel, without more, do not qualify as an "official act."

Through the indictment, the government set out to prove that Mr. Lindberg and Mr. Gray bribed Commissioner Causey "to take official action favorable to [Mr. Lindberg's] companies." Indictment ¶ 12. But even accepting the evidence in the light

---

* The text, purpose, and history of 18 U.S.C. § 666 require an "official act" in cases involving a government or agency. Any other view would trigger the same constitutional concerns the Supreme Court sought to avoid in *McDonnell*. Although the Fourth Circuit declined to read Section 666 this way, Mr. Lindberg presses this argument to preserve it for further appellate review. Mr. Lindberg concedes this Court is bound by the Fourth Circuit's prior decision in this case, which put its own gloss on the business-or-transaction element. *Lindberg*, 39 F.4th at 169-75.

8

most favorable to the government, all the government proved was a request to reassign general oversight of Mr. Lindberg's companies from one deputy to another. This proof fails to satisfy at least two of the three requirements of an "official act" that the government must establish under *McDonnell*.

First, the government's case fails because the internal reassignment of oversight from one deputy to another is "not of the same stripe as a lawsuit before a court, a determination before an agency, or a hearing before a committee." *McDonnell*, 136 S. Ct. at 2369. In the latter instances, the government is exercising its sovereign power to adjudicate, execute, or legislate the rights or responsibilities of the governed. In contrast, the internal transfer of oversight from one deputy to another does not amount to adjudicating, enforcing, or legislating the rights or responsibilities of the governed.

Here, Mr. Lindberg and Mr. Gray sought only that a different official be given the authority to review Mr. Lindberg's businesses without asking for a particular outcome on any pending matter. As the Supreme Court emphasized in *McDonnell*, the decision "to refer a constituent to another official" does not, without more, qualify as an official act. *Id.* at 2371. That is not at all surprising. A request to reassign tasks from one official to another—or to be referred to another official—is not the same as a lawsuit, hearing, or administrative determination. *See id.* at 2372.

Second, the reassignment of tasks was not a "decision" or "action *on*" the review of Mr. Lindberg's businesses. *Id.* at 2370 (emphasis in original). Under *McDonnell*, it

is not enough that the reassignment of tasks was "*related* to a pending question or matter"; it must advance the merits of the matter or question. *Id.* (emphasis added).

The Supreme Court illustrated this point in *McDonnell*. There, the Court explained that "initiat[ing] a research study" would qualify as an official act, because it was like an administrative determination. *Id.* And the Court explained that "narrowing down the list of potential research topics" for the study would qualify as a decision on the research study, because it helped advance the merits of the ultimate determination whether to initiate the study. *Id.* At the same time, the Court emphasized, merely "refer[ring] a constituent to another official" capable of initiating the study did not qualify as an official act. *Id.* at 2371. That may be a decision or action "related to" an "official act," but it is not itself a decision or action *on* an official act because it does not advance the ultimate merits of a formal exercise of governmental authority. *See id.*

Here, the government did not establish that in requesting a reassignment of tasks, the Defendants sought a particular outcome on the review of Mr. Lindberg's companies or, for example, a narrowing of the range of potential regulatory outcomes. *See, e.g.*, Day 3 Rough Tr. 52:23-53:8 (Commissioner Causey) (conceding the Defendants never offered anything of value in exchange for "rais[ing] the affiliate investment amount"). Rather, the evidence established that, even while being secretly recorded, Mr. Lindberg and Mr. Gray sought only fairness, not favoritism:

> GL:  "We don't have an industry without good regulation, and we're, we're happy to be well regulated, we just don't want to be subject to personal vendettas." GEL Exh. 164, at 36:3-5.

GL:    ". . . And Debbie will do a competent job, and a very rigorous job, but she doesn't have a built in bias against us. She, she's just, she's a regulator. She's going to be tough and fair, that's all we need." GEL Exh. 189, at 18:14-17.

GL:    "So, we don't, we don't have a problem with thorough, rigorous, slow regulation. I mean, I'm not going anywhere." GEL Exh. 192, at 32:34-33:1.

GL:    ". . . there's people at the department, specifically Jackie, that just don't like us. And it's not good regulation to just not like someone. You gotta enforce the laws whether you like the guy or not. It's, you know, we have a, what's great about America is the laws aren't enforced on people based on whether or not you're liked or not. They're enforced on everybody the same. And so, all we're asking for is an even playing field." GEL Exh. 195, at 19:4-11.

Moreover, Ms. Walker, the deputy who Mr. Lindberg suggested to oversee his companies, testified that there was no "side deal" with Mr. Lindberg or his companies, Day 6 Rough Tr. 28:16-19; that neither Mr. Lindberg nor his companies ever approached her about doing something inappropriate, *id.* 28:20-22; and that there was no type of guaranteed financial benefit that would come from her looking over the files instead of Jacquelyn Obusek, *id.* at 25:7-9. Nor, for that matter, did the government introduce any evidence to this effect. *See, e.g.*, Day 7 Rough Tr. 19:10-11 (Gov't Closing) (conceding that there is "no evidence that Ms. Walker was corrupt or had some sort of side deal with [the Defendants]"); *see also* Day 4 Rough Tr. 232:12-233:4 (Special Agent Granozio) (conceding the government had no evidence of the same); *id.* 28:4-8 (Commissioner Causey) (conceding there was "no evidence" that "Debbie Walker ever promised Greg Lindberg or GBIG a guaranteed benefit").

Moreover, when the Insurance Commissioner makes a decision or takes action *on* a pending matter—action that can affect an "insurer, insurance producer, or other

11

person" subject to the Insurance Code—the Department is required to issue an order "in writing and signed by the Commissioner or by his authority." N.C. Gen. Stat. § 58-2-45. For example, if the Department were to promulgate regulations affecting insurers or adjudicate the merits of the review of an insurance company, that would plainly take the form of an administrative determination and undoubtedly qualify as an "official act." Yet there was undisputed testimony that switching assignments within the Department of Insurance requires only informal conversation or an e-mail, not a written order bearing the Commissioner's signature. Day 6 Rough Tr. 26:6-28:15 (Ms. Walker) (testifying that the transfer of files from one employee to another was "fairly routine" and a "nonevent," required no "formal or official action," needed no "signature," and could be accomplished by "e-mail" or through a "conversation"). These State rules and norms reinforce the limits of what the government proved here: The informal reassignment of tasks from one employee to another does not qualify as an "official act" within the meaning of *McDonnell*.

If the outcome were otherwise—that is, if an "official act" is broad enough to cover the mere reassignment of tasks—then this prosecution would raise the same constitutional issues that the Supreme Court sought to avoid in *McDonnell*. Most notably, citizens have the right to petition the government, ask for changes, and make campaign contributions. *See, e.g.*, *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203-04 (2014). Yet the government's prosecution of Mr. Lindberg and Mr. Gray will "cast a pall of potential prosecution" over citizens' demands for better government. *McDonnell*, 136 S. Ct. at 2372. Mr. Lindberg and Mr. Gray did not request an outcome

on the Department's examination of Mr. Lindberg's companies. They sought a fair and reasonable examination by a competent and neutral decision-maker. That is the "basic compact underlying representative government"—that constituents may vote and contribute based on the responsiveness of their elected officials. *Id.*

The government's prosecution of Mr. Lindberg and Mr. Gray also raises significant vagueness concerns. As noted above, *McDonnell* held that referring a constituent to an official capable of resolving a pending matter, without more, is not an "official act." *Id.* at 2371. Yet under the government's theory here, a constituent crosses the line if he requests a referral to a different official. The distinction between these two scenarios is not obvious, and for that reason, the government's conception of "the term 'official act' is not defined 'with sufficient definiteness that ordinary people can understand what conduct is prohibited,' or 'in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 2373 (quoting *Skilling v. United States*, 561 U.S. 358, 402-03 (2010)).

Lastly, the federal government's prosecution of Mr. Lindberg and Mr. Gray for requesting a change of regulators, and nothing more, "raises significant federalism concerns." *Id.*; *accord Sorich v. United States*, 129 S. Ct. 1308, 1310 (2009) (mem.) (Scalia, J., dissenting from denial of cert.) (noting the serious federalism concerns posed by allowing the federal government to "define the fiduciary duties" of State and local officials). North Carolina is permitted to make its own judgments in balancing the sometimes-competing interests between robust anti-corruption laws and the rights of its citizens to make requests of and support candidates for public office.

13

In the past, the government has suggested that the constitutional concerns at issue here are extinguished by the requirement of a *quid pro quo*, but that view is mistaken. Any bribery or extortion statute will, by definition, include a *quid-pro-quo* requirement. Yet the Supreme Court felt the need to narrow such statutes further in *McDonnell*, explaining that a *quid-pro-quo* requirement did not mitigate the "significant constitutional concerns" posed by the government's "expansive interpretation of 'official act.'" 136 S. Ct. at 2372.

The government's case here is contrary to the reasoning and the outcome of *McDonnell*. The evidence of an "official act" is legally insufficient, and the Court should therefore set aside Mr. Lindberg's conviction on Count One.

### B.    The reassignment of tasks and the internal movement of personnel do not qualify as the "business" or a "transaction" of the North Carolina Department of Insurance.

The Defendants' request for a different regulator also does not qualify under the business-or-transaction element of Section 666. That element limits federal-program bribery to a *quo* involving the "business, transaction, or series of transactions of [an] organization, government, or agency." 18 U.S.C. § 666(a)(2).

As the Fourth Circuit emphasized in this case, "the 'business or transaction' element" does "*not*" encompass "nearly any activity by a public official." *Lindberg*, 39 F.4th at 174 (emphasis added). "Notably," the court of appeals continued, "the business at issue is not the business *of the agent* receiving the bribe but, rather, the business *of the entity* on whose behalf the agent is authorized to act." *Id.* (emphasis in original). "Thus, the relevant business will naturally vary according to the purpose and operations of the covered entity." *Id.* And the "business" or "transaction" must be

"something relatively concrete and circumscribed like an action item rather than a broad policy goal." *Id.*

Although "business" is not limited to "commercial conduct," where the covered entity is a "government" or "agency," the business of that government or agency must be understood to "mean 'the matters that come before [that] deliberative [body] for its consideration and action.'" *Id.* at 173 (quoting Black's Law Dictionary 226 (9th ed. 2009)). Or stated more simply, the term "business" must be understood as the "'work that has to be done,'" or "'matters that have to be attended to,'" by the government or agency. *Id.* (quoting *United States v. Robinson*, 663 F.3d 265, 274 n.4 (7th Cir. 2011), which in turn quotes New Oxford American Dictionary 1838 (3d ed. 2010)). The common thread of all these definitions is the external work of the government or agency, *see id.* (quoting various other definitions of "business"), which, as the Fourth Circuit recognized will "naturally vary according to the purpose and operations" of the government or agency, *id.* at 174.

Under any fair construction of the business-or-transaction element, the internal reassignment of tasks, without more, does not qualify as the business of the North Carolina Department of Insurance. Looking, as the Fourth Circuit directed, at "the purpose and operations" of the Department, *id.* at 174, it is "charged with the *execution* of laws relating to insurance," N.C. Gen. Stat. § 58-2-1 (emphasis added). That means the work of the Department is carrying out the enforcement of laws and regulations related to insurance within North Carolina. And that makes sense as an intuitive matter. The Department of Insurance is an executive agency exercising

authority on behalf of the State of North Carolina. *See* N.C. Const., art. III, secs. 7(1) & 11 (placing the Commissioner of Insurance and his department in the executive branch). The Department may be made up of individual agents. But ultimately, those agents are appointed as "necessary for the proper execution of the work *of the Department.*" N.C. Gen. Stat. § 58-2-25(a) (emphasis added).

In simple terms, the agents of the Department may change, but its work remains the same. To be sure, where a staffing change is sought because that change will affect the substantive work of the Department, that might be sufficient to show that a defendant sought to alter the business of the Department. But here, there is no evidence that Mr. Lindberg and Mr. Gray sought any outcome on the Department's regulation of Mr. Lindberg's companies. Day 3 Rough Tr. 52:23-53:8 (Commissioner Causey) (conceding the Defendants never offered anything of value in exchange for "rais[ing] the affiliate investment amount"); Day 4 Rough Tr. 232:12-233:4 (Special Agent Granozio) (conceding the government had no evidence of any guaranteed benefit on the Defendants' part in requesting Ms. Walker over Ms. Obusek); *id.* 28:4-8 (Commissioner Causey) (conceding there was "no evidence" that "Debbie Walker ever promised Greg Lindberg or GBIG a guaranteed benefit"); Day 6 Rough Tr. 25:7-9, 28:16-22 (Ms. Walker) (testifying there was no side deal or guaranteed benefit associated that would come for her looking over the files instead of Ms. Obusek); Day 7 Rough Tr. 19:10-11 (Gov't Closing) (conceding that there is "no evidence that Ms. Walker was corrupt or had some sort of side deal with [the Defendants]").

The distinction between the internal assignment of tasks and the external work of the Department also aligns with the Fourth Circuit's distinction between "the business *of the agent*" and "the business *of the entity* on whose behalf the agent is authorized to act." *Lindberg*, 39 F.4th at 174 (emphasis in original). It may well be the business of *Commissioner Causey* who he assigns internally to handle a particular task on behalf of the Department. But the business of the Department of Insurance— the execution of laws relating to insurance—will be performed regardless of who is assigned to a particular task. And as noted above, there was no evidence that Mr. Lindberg or Mr. Gray requested a change from Ms. Obusek to Ms. Walker because Ms. Walker agreed to regulate Mr. Lindberg's businesses any differently than Ms. Obusek. At the end of the day, the government has failed to submit sufficient evidence that Mr. Lindberg and Mr. Gray sought to corruptly influence or reward the substance of any business or transaction of the Department of Insurance.

The government apparently takes a different view—that "selecting the person who is going to exercise the authority of the Department of Insurance is the business of the Department of Insurance," Day 7 Rough Tr. 17:10-12—but there is no limiting principle associated with this circular logic. It would mean that "nearly any activity by a public official" taken within the scope of his employment would qualify as the "business" of a government or agency. *McDonnell*, 136 S. Ct. at 2368. Who attends a particular meeting at the Department could be characterized as the business of the Department of Insurance—so, too, could making a call to an official in a different State department of insurance. Yet the Fourth Circuit was emphatic that, "whatever

the outer bounds of 'business,' the term does not include the conduct the *McDonnell* court was primarily concerned with: a typical meeting, call, or event (without more)." *Lindberg*, 39 F.4th at 175. And the Supreme Court added to that list merely "refer[ing] a constituent to another official" who can act on behalf of the government. *McDonnell*, 136 S. Ct. at 2371. That is all that was requested here—that Commissioner Causey refer Mr. Lindberg's companies to a different official capable of exercising regulatory authority over his companies.

What the Defendants requested here may appear unseemly to the Court. But the federal bribery statutes are reserved for a limited set of "specific attempts . . . to influence governmental action." *Buckley v. Valeo*, 424 U.S. 1, 28 (1976) (per curiam). Here, there was no evidence Mr. Lindberg and Mr. Gray sought to corruptly influence or reward Commissioner Causey in connection with any outcome on the Department's regulation of Mr. Lindberg's companies. Accordingly, the Court should enter a judgment of acquittal on Count Two as well.

**C.    To the extent there is a distinction between task reassignment and moving personnel, a new trial is warranted because the Court declined to instruct the jury it could not convict on the former.**

During trial, the government suggested a distinction between task reassignment and moving personnel to different divisions within the Department, stating that the Defendants "might have settled for a file move," but what they first asked for was "a staff realignment." Day 7 Rough Tr. 23:10-20. The government viewed this as a distinction without a difference—"it doesn't matter"—because either way the Defendants were attempting to "pick[ ] the person that's going to exercise the

18

government's authority over your insurance companies." *Id.* at 23:14-16. And the Defendants agree—the distinction doesn't matter—but that's because asking for a different regulator is not asking for an "official act" or a request to alter the "business" of the North Carolina Department of Insurance.

Notably, there was no evidence that the Defendants ever requested that Ms. Obusek be fired or demoted:

Q.    Jackie Obusek was not getting fired?

A.    Correct.

Q.    Jackie Obusek's office wasn't even going to move?

A.    Correct.

Q.    Her title wasn't going to change?

A.    Right.

Q.    We're just moving, you know, the -- I know it's electronic. We're moving the Lindberg files from A to B; right? That's what they're asking for.

A.    Right. That's what they're asking, yes, sir.

Day 3 Rough Tr. 52:13-22. That testimony aligns with the recordings: Mr. Gray was emphatic that they were "not interested in seeing anybody be dismissed or demoted or anything of the sort." GEL Exh. 194, at 12:17-18. And Mr. Lindberg agreed, stating that the Commissioner should "[l]eave Debbie where she is and just tell her she is going to handle our stuff." GEL Exh. 189, at 10:17-18*; see also* GEL Exh. 169, at 93:5-8 (Mr. Lindberg) (stating that he "do[es]n't think it's necessary" to "fire Jackie").

But even if there were evidence of some kind of staff realignment, and even if this is sufficient to show an "official act" or an attempt to influence the business of

19

the Department, a new trial still would be warranted. That's because, even if a "staff realignment" of this nature is a viable theory of criminal liability, the Court declined to instruct the jury that it could not convict based solely on a reassignment of tasks. *See* Day 5 Rough Tr. 40:17-21; *see also* Dkt. No. 433, at 4, 12 (specifically preserving this issue); Day 5 Rough Tr. 39:15-40:16, 65:1-4 (same). And as demonstrated above, the mere reassignment of tasks is, without question, not an "official act" or the "business" of the Department.

A similar error infected the governor's conviction in *McDonnell*. There, Governor McDonnell argued—and the Supreme Court ultimately agreed—that setting up a meeting or referring a constituent to another official capable of performing an official act, without more, does not qualify as an official act. *McDonnell*, 136 S. Ct. at 2371. The Court noted that other alleged conduct, like initiating a research study, would qualify as an official act. *Id.* at 2374-75. As a result, the Court explained it was possible, based on the evidence, that Governor McDonnell "agreed to exert pressure on [state] officials to initiate the research studies or add Anatabloc to the state health plan, but it is also possible that the jury convicted Governor McDonnell without finding that he agreed to make a decision or take an action on a properly defined 'question, matter, cause, suit, proceeding, or controversy.'" *Id.* at 2374-75. "To forestall that possibility," the Court continued, "the District Court should have instructed the jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* at 2375. So too here. Merely reassigning a task from one official to

20

another does not qualify as a decision or action on that task, nor does it qualify as the "business" of the Department of Insurance—and the Court should have so instructed the jury.

In short, because the jury was permitted to convict Mr. Lindberg based on a legally untenable theory, the Court should, at a minimum, order a new trial. A request to move files from one official to another—without any guaranteed outcome on the review of those files—is not actionable under the federal bribery statutes.

## II.    A new trial is warranted based on instructional and evidentiary errors.

In the alternative, this Court should order a new trial based on instructional and evidentiary errors that undermine the validity of the jury's verdicts. As explained below, this Court gave incorrect instructions on the requisite level of intent; erred by declining to admit two State statutes as evidence that the request at issue here—the reassignment of tasks—was not an "official act" or the "business" of the Department of Insurance; erred by not instructing the jury on alternative theories for valuing the $5,000-or-more element associated with Count Two; and should not have admitted two e-mails that Mr. Lindberg sent to himself of to-do items that had little to no probative value and that were unfairly prejudicial. Particularly when viewed collectively, these errors warrant a new trial.

### A.    The Court gave incorrect instructions on the requisite level of intent and improperly lowered the government's burden on both counts.

In his requested jury instructions, Mr. Lindberg argued that the requisite level of intent for honest-services wire fraud and federal-program bribery required the

government to prove that the Defendants had "corrupt" intent—that they knew what they were "doing is unlawful." Dkt. No 416, at 68, 76; *see also* Day 5 Rough Tr. 55:5-9, 56:2-9 (renewing objection to intent instruction as to Count One). This Court agreed as to Count Two, but not as to Count One. *See* Day 7 Rough Tr. 102:5-15; 109:3-8 (charging the jury that the Defendants needed to act "corruptly" as to Count Two but "knowingly" as to Count One); *see also* Day 5 Rough Tr. 55:15-16 (Court) (stating that it is "going to leave corruptly out" of the instructions on Count One). As explained below, that was error. Honest-services wire fraud is limited to core bribery and kickback schemes, which require "corrupt" intent.

But even if the Court disagrees, its instruction on the requisite intent for Count One ("knowingly") infected the requisite level of intent that applied to Count Two ("corruptly"). In supplying the jury with the definition of "knowingly," the Court informed the jury that, with respect to "*both counts*, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." Day 7 Rough Tr. 110:22-111:5 (emphasis added). "In other words," the Court continued, "mistake of law is no defense." *Id.* at 111:5-6. This instruction undermined the Court's other instructions on the requisite level of "corrupt" intent for Count Two. Because intent was Mr. Lindberg's principal defense, and because the jury may have believed that it was not required to find that Mr. Lindberg knew his acts were unlawful even with respect to Count Two, he should be granted a new trial for this reason, too.

### 1. Counts One and Two required "corrupt" intent.

As Mr. Lindberg argued throughout these proceedings, both counts required proof of "corrupt" intent. The government agreed as to Count Two, Day 5 Rough Tr. 21:12-13, and this Court ultimately instructed the jury as such, Day 7 Rough Tr. 102:5-15. But on Count One, the government opposed, *see* Day 5 Rough Tr. 55:5-14, 57:11-12, and this Court declined to instruct the jury that honest-services wire fraud requires corrupt intent, *see id*. 55:15-16; Day 7 Rough Tr. 109:3-8. That was error.

In *Skilling v. United States*, the Supreme Court limited honest-services wire fraud to "core" cases of corruption involving "bribery or kickback schemes." 561 U.S. 358, 407 (2010). And in doing so, the Court emphasized this limitation drew support "from federal statutes proscribing—and defining—similar crimes. *See, e.g.*, 18 U.S.C. §§ 201(b), 666(a)(2); 41 U.S.C. § 52(2)." *Id.* at 412. Notably, the two bribery statutes mentioned in *Skilling*—18 U.S.C. §§ 201(b) and 666(a)(2)—both require that a defendant act "corruptly."

Perhaps for this reason, in *McDonnell*, the parties "define[d] honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201," which, the Supreme Court emphasized, "makes it a crime for 'a public official or person selected to be a public official, directly or indirectly, *corruptly'* to demand, seek, receive, accept, or agree 'to receive or accept anything of value' in return for being 'influenced in the performance of any *official act.*'" 136 S. Ct. at 2365 (emphasis added) (quoting 18 U.S.C. § 201(b)(2)). Any other standard would not involve "core" bribery as the Supreme Court defined that term in *Skilling*.

In the absence of "corrupt" intent, a jury could find that protected political speech qualifies as honest-services wire fraud. For example, during the confirmation process for Justice Kavanaugh, a political group pledged to sponsor advertisements against Senator Susan Collins if she voted yes on then-Judge Kavanaugh's confirmation. Kristine Phillips & Eli Rosenberg, *Susan Collins calls donations to her opponent a 'classic quid pro quo' to extort her*, Wash. Post, Oct. 8, 2018, *available at* https://tinyurl.com/thvkn2y6. And a conservative group pledged to spend hundreds of thousands of dollars to "thank" Senator Collins for her yes vote. Eli Rosenberg, *Collins blasted 'dark money' groups in Kavanaugh fight. One just paid to thank her for her vote*, Wash. Post, Oct. 12, 2018, *available at* https://tinyurl.com/5af8sh4w. And satirist John Oliver recently pledged to pay Justice Thomas $1 million a year for the rest of his life if he formally resigned his seat from the Supreme Court. Ramon Antonio Vargas, *John Oliver offers to pay Clarence Thomas $1m a year if he resigns from supreme court*, The Guardian, Feb. 19, 2024, *available at* https://tinyurl.com/2dhtfk2v. Although these groups and Mr. Oliver were simply using "money amassed from the economic marketplace to fund their speech," *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 905 (2010), the thing that likely spared them from criminal prosecution was the fact that they lacked "corrupt" intent. *See* Natalie Venegas, *Did John Oliver Break Law Offering Clarence Thomas $1M to Retire?*, Newsweek, Feb. 20, 2024, *available at* https://tinyurl.com/36k7mp9x (quoting a former federal prosecutor who reasoned that Mr. Oliver would not be prosecuted

because his "offer wasn't likely made corruptly, adding that a corrupt intent is required to be charged under 18 US Code 201").

Thus, honest-services wire fraud must be read to embrace two requirements from 18 U.S.C. § 201: (1) "official act" and (2) "corruptly." The Court's failure to define "corruptly" as an element of honest-services wire fraud was therefore error.

>    ## 2. The Court improperly instructed the jury that, as to both counts, "the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful."

Even if this Court reaffirms that a corrupt intent goes only to Count Two, the Court erred when it instructed the jury that, with respect to "*both counts*, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." Day 7 Rough Tr. 110:22-111:5 (emphasis added). That instruction directly contradicted the Court's instruction as to Count Two—that "corruptly" requires "knowledge that the conduct was unlawful," *id.* at 102:5-7, and it undermined the Court's instruction that the Defendants could not be found guilty on Count Two if they "acted in accordance with a good faith misunderstanding of the law," *id.* at 114:25-115:1.

To be sure, the Court instructed the jury that "[e]ach charge and the evidence pertaining to it should be considered separately," *id.* at 85:7-8; "'[y]ou must consider each count and the evidence relating to it separate and apart from every other count." *Id.* at 85:8-11; and "[y]our verdict on any one count should not control your verdict on the other," *id.* at 85:13-14. But that is not enough to inoculate Count Two against infection.

In the prior appeal in this case, the government invoked the same language to claim an absence of infection among the two counts, but the Fourth Circuit disagreed. *Lindberg*, 39 F.4th at 164. It noted that this Court's "instructions on each count were not as separate as the government contends." *Id.* It then cited several examples where this Court simultaneously instructed the jury on the substance of both counts. *Id.* at 164-65. Based on this, the Fourth Circuit concluded that this Court's "erroneous 'official act' instruction [associated with Count One] may, therefore, have effortlessly bled into the jury's consideration of Count Two—federal funds bribery." *Id.* at 165.

The same outcome is compelled here. The Court explicitly instructed the jury that, with respect to "both counts, the government is not required to prove that the defendant knew beyond all reasonable doubt that his acts were unlawful." Day 7 Rough Tr. 111:3-5. Respectfully, the Court erred in this regard.

### 3.    These errors were not harmless.

The errors in this Court's intent-based instructions were not harmless—an issue on which the government bears the burden of showing. *E.g.*, *United States v. Brizuela*, 962 F.3d 784, 798 (4th Cir. 2020). The Defendants' principal defense was structured around a lack of criminal intent, and the Court acknowledged that the jury could have gone "either way." Day 7 Rough Tr. 128:8. At a minimum, the Court "[can]not [be] confident that the erroneous instruction on Count One did not play any role in the jury's verdict on Count Two." *Lindberg*, 39 F.4th at 164 (alterations and quotation marks omitted) (quoting *Connecticut v. Johnson*, 460 U.S. 73, 87 (1983)). And because Count One likewise required an instruction on "corrupt" intent, the Court should order a new trial on both counts.

26

**B.    The Court erred by declining to admit evidence of two State statutes, which tended to show that the Defendants did not request an "official act" or anything that could be characterized as the "business" of the Department of Insurance.**

During trial, Mr. Lindberg moved for the admission of two State statutes, N.C. Gen. Stat. §§ 58-2-45 and 58-2-132, that bore on the jury's determination of whether the alleged request at issue here—the transfer of files from one deputy commissioner to another—constituted a prohibited *quo*. *See* Day 6 Rough Tr. 41:5-8; *see also* Dkt. No. 434. These statutes were not only admissible but also relevant in that they make it more probable as a factual matter that the request at issue here did not involve an "official act" or the "business" of the Department of Insurance. And given that the existence of a prohibited *quo* was hotly contested as to both counts, the Court's decision to decline to admit these State statutes was not harmless.

**1.    The statutes were plainly relevant to whether the Defendants requested a prohibited *quo*.**

The two State statutes at issue here bear on how the North Carolina Department of Insurance conducts its business of regulating insurers, insurance agents, insurance brokers, and any other person or persons subject to regulation by the Department. The first statute, N.C. Gen. Stat. § 58-2-45, provides in pertinent part that whenever "the Commissioner is authorized to grant any approval, authorization or permission or to make any other order affecting any insurer, insurance producer, or other person or persons subject to the provisions of Articles 1 through 64 of this Chapter, such order shall not be effective unless made in writing and signed by the Commissioner or by his authority." The second statute, N.C. Gen. Stat. § 58-2-132, governs the process by which the Department conducts an

27

examination of insurers—and shows certain formal processes for reaching this form of administrative determination. Among other things, this provision provides certain rights to the insurer, including a hearing, and specifies the processes for considering and obtaining evidence.

These statutes are self-authenticating, *see* Fed. R. Evid. 902(5), fall under two exceptions to hearsay for public records, *see* Fed. R. Evid. 803(6), (8), and in any event are the proper subject of judicial notice, *see* Fed. R. Evid. 201. As a result, they are admissible; the only potential issue is relevancy, and these statutes plainly satisfy that low bar.

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Those requisites are satisfied here.

There is no evidence that the transfer of regulatory oversight from one employee to another *ever* required an order in writing signed by the Commissioner. Ms. Walker was emphatic that the transfer of files from one employee to another was "fairly routine" and a "nonevent," required no "formal or official action," needed no "signature," and could be accomplished by "e-mail" or through a "conversation." Day 6 Rough Tr. 26:6-28:15. Even Commissioner Causey conceded files are transferred among supervisors without his involvement. Day 3 Rough Tr. 47:20-48:11.

The fact that, by operation of State law, the Commissioner may affect the rights of regulated entities only by a signed, written order tends to make it more likely that a transfer that has never been understood to require such a signed order

does not amount to an "official act" or the "business" of the Department of Insurance. Similarly, the fact that there were no formalities around such a transfer—coupled with evidence of the procedural rights of parties under examination—also tends to make it more likely that the requested reassignment at issue here was not an official act or the "business" of the Department.

The Fourth Circuit has suggested that State statutes and rules may be admitted when they inform the elements of a federal criminal offense. For example, in *United States v. Titus*, the Fourth Circuit approved an order of the district court taking judicial notice of State statutes and rules defining duties of attorneys and investment advisors where "[c]entral to the government's theory of the case was that [defendant] committed fraud, in part, by failing to fulfill his duties of disclosure to his clients and investors." 475 F. App'x 826, 834 (4th Cir. 2012) (non-precedential). And as specifically relevant to Mr. Lindberg's case, the Fourth Circuit clarified that the Defendants were entitled to present evidence and argument that the conduct alleged does not qualify as an "official act." *Lindberg*, 39 F.4th at 163 (citing Defs.' Br. 24, which in turn cites N.C. Gen. Stat. § 58-2-45).

Moreover, the government itself claimed the relevancy of State-law standards. In attempting to show that the Defendants acted with "corrupt" intent, the government argued that the Defendants "knew it was unlawful to direct NCGOP contributions to Commissioner Causey" under State "election law," but "they did it anyway." Day 7 Rough Tr. 78:17-22 (Gov't Rebuttal Argument); *id.* 27:8-25 (Gov't Closing Argument) (emphasizing the same). And the government made reference to

29

State-law standards in the Indictment. *See* Indictment ¶¶ 2, 8 (alleging State statutes that govern the conduct of the Commissioner of Insurance and State election-law standards); *cf.* Day 6 Rough Tr. 43:12-18 (Def. Counsel) (noting that the government alleged the existence of State statutes in the indictment).

In short, the provisions of the statutes that Mr. Lindberg proffered bear directly on the policy of North Carolina to require certain formalities when the Commissioner engages in a formal exercise of governmental authority. The fact that the alleged ask at issue here—the reassignment of regulatory review from one deputy commissioner to another—did not trigger these processes tends to show that it was more likely that it did not involve an "official act" or the business of the Department. It also corroborated Mr. Causey's testimony that all the Defendants asked for was the movement of files. Day 3 Rough Tr. 51:7-52:22. Those issues were plainly relevant to the jury's task of evaluating whether the Defendants requested something that amounted to an "official act" or the "business" of the Department of Insurance.

> ## 2. The Court's relevancy determination was incomplete, which in turn infected its balancing inquiry under Rule 403 of the Federal Rules of Evidence.

In declining to admit N.C. Gen. Stat. §§ 58-2-45 and 58-2-132, the Court held that the statutes were not relevant because the case involved "a sting operation," Commissioner Causey therefore never proceeded with the requested transfer, and there was no way "to find out if he signed [an order authorizing the transfer] or if he failed to sign [such an order]." Day 6 Rough Tr. 45:20-25. The Court continued, if the transfer did go forward, and Commissioner Causey was required to sign an order but didn't, "the bribe would still be effective whether he signed the thing or didn't sign

30

the thing." *Id.* at 46:1-2. As a result, the Court suggested that the State statutes were unnecessary "to settle an issue in this case." *Id.* at 46:10.

Respectfully, the Court confused the issue of what Commissioner Causey might have done or intended with separate elements the jury was required to find—specifically, the official-act and business-or-transaction elements. It is true that Commissioner Causey never proceeded with the requested transfer, and no one knows what he might have done. But the issue before the jury was whether, as a factual matter, the *requested transfer* would have constituted an "official act" and the "business" of the Department of Insurance. *See Lindberg*, 39 F.4th at 163 (explaining that the jury needed to decide whether "'the removal or replacement of a [S]enior [D]eputy [C]omissioner *would* constitute an "official act"'"); *id.* at 174 (discussing aspect of the business-or-transaction element that a jury must find). And the jury had before it undisputed evidence that no one at the Department of Insurance ever issued a written order signed by the Commissioner to authorize the transfer of files from one employee to another. *See* Day 6 Rough Tr. 26:6-28:15.

That the Department of Insurance was required by State law to abide by certain formalities when it made administrative determinations but that it had never done so when effectuating a file transfer makes it unquestionably more likely that such a transfer did not amount to an "official act" or the "business" of the Department. And because the official-act and business-or-transaction elements are mixed questions of fact and law for the jury's determination, *see, e.g.*, *Lindberg*, 39 F.4th at

160-61, 164-65, it was very much the duty of the jury to settle whether the Defendants requested what would have amounted to a prohibited *quo*.

The Court also suggested that, even if these State statutes were relevant, "the danger of unfair prejudice outweighs their probative value." Day 6 Rough Tr. 46:18-19. But respectfully, the Court could not engage in an appropriate balancing under Rule 403 if it did not appreciate the full probative value of the evidence. *See Swajian v. Gen. Motors Corp.*, 916 F.2d 31, 34 (1st Cir. 1990) (holding that the district court "ignored the probative value" of the excluded evidence to the defendant's case and could not have engaged in an appropriate balancing analysis as a result); *United States v. Ham*, 998 F.2d 1247, 1253 (4th Cir. 1993) (finding error in the district court's assessment of relevancy and probativeness, which led the Fourth Circuit to conclude that the district court abused its discretion in conducting its balancing inquiry under Rule 403). And as Mr. Lindberg's counsel noted, any danger of unfair prejudice or concern about confusion could be addressed through an instruction that the jury's inquiry is ultimately governed by federal law—specifically, the various components of an "official act" and the business-or-transaction element that the Supreme Court and the Fourth Circuit clarified, respectively, that a jury must find. Day 6 Rough Tr. at 43:19-21.

"[M]erely because" these statutes were "damaging" to the government's case does not make them "prejudicial" to the government. *United States v. Bell*, 901 F.3d 455, 465 (4th Cir. 2018) (citation omitted). Indeed, properly framed, the State statutes would not have had an "'undue tendency to suggest decision on an improper basis.'"

*Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403, adv. cmt. n.). Rather, they would have provided the jury with two more data points to evaluate whether the request here would have called for a decision or action on something like an administrative determination, and whether staffing decisions that do not alter the rights of regulated parties rise to the level of the "business" or a "transaction" of the Department of Insurance.

### 3.    The error was not harmless.

The official-act and business-or-transaction elements were vigorously litigated, and they formed a principal basis of Mr. Lindberg's defense. They were also the express subject of the Fourth Circuit's prior decision remanding this case for a retrial. *See Lindberg*, 39 F.4th at 163-65. There, the Fourth Circuit stated that the Defendants should have been permitted to "present evidence" and argument that the removal of Senior Deputy Commissioner Obusek was "not an official act." *Id.* at 163. In fact, the Fourth Circuit cited arguments raised in the Defendants' brief, including a page where the Defendants referenced N.C. Gen. Stat. § 58-2-45, as involving the types of arguments and evidence Defendants should have been permitted to offer. *Id.* (citing Defs.' Br. 24, which in turn cites N.C. Gen. Stat. § 58-2-45).

At bottom, the existence of the State statutes tends to show that it was more likely that the requested transfer would not have involved an "official act" or the "business" of the Department. Under these circumstances, the government cannot show that the exclusion of these statutes was not harmless.

### C.    The Court erred in failing to instruct the jury on alternative methods for evaluating the $5,000-value element under Count Two.

On Count Two, Mr. Lindberg proposed a neutral instruction on assessing the value of the subject matter of the alleged bribe, which must be $5,000 or more. That instruction included the government's preferred methodology (a market approach based on the value of the alleged bribe as evidence of the value of the subject matter of the alleged bribe) and the Defendants' preferred methodology (the cost to the government of providing the subject matter of the alleged bribe). Dkt. No. 416, at 78 (Defs.' Proposed Jury Instructions); *accord* Dkt. No. 433-1, at 17 (proposing the same language as a revision to the Court's initial proposed jury instructions); *see also* Day 5 Rough Tr. 42:6-20 (explaining the basis for the Defendants' proposed instruction). The Court instructed the jury only on the government's proposed methodology. Day 7 Rough Tr. 101:14-21 (punctation added).

Respectfully, the Court erred. The Court was required to give the Defendants' proposed instruction because it: "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with [a] point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009) (quoting *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995) (internal quotation marks omitted)). Moreover, because Mr. Lindberg's defense was impaired by the Court's decision to decline to provide the instruction, the error was not harmless.

> 1. **The Court erred in declining to provide Mr. Lindberg's alternative methodology for valuing the subject matter of the alleged bribe.**

Federal-program bribery is limited to a request related to "any business, transaction, or series of transactions of [an] organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(2). In the prior appeal in this case, the Fourth Circuit emphasized that "'the *subject matter* of the bribe must be valued at $5,000 or more,'" not the bribe itself, which can be "'anything of value.'" *Lindberg*, 39 F.4th at 173 (emphasis added) (quoting *United States v. Fernandez*, 722 F.3d 1, 13 (1st Cir. 2013)).

Notably, the Fourth Circuit explained, where the subject matter of the alleged bribe is "intangible, courts have relied on a variety of valuation methods." *Id.* at 174. Among those, some courts have looked to "the value of the bribe (the market approach) and the value of the benefit received by the bribe-giver or third parties with an immediate interest in the transaction" (the value-of-the-benefit approach). *Id.* (citations and quotation marks omitted); *see also United States v. Tillmon*, 954 F.3d 628, 644-46 (4th Cir. 2019). Another acceptable form of valuation involves the cost to the government of providing the subject matter of the alleged bribe. *Cf. United States v. Foley*, 73 F.3d 484, 493 (2d Cir. 1996) (considering the $5,000 threshold in terms of "financial value to the State of Connecticut"), *abrogation on other grounds recognized by United States v. Santopietro*, 166 F.3d 88, 93 (2d Cir. 1999) (holding that it was no longer good law to hold that Section 666 was *restricted* to requiring the United States to prove the "value to the governmental entity that received the requisite amount of federal funds" (emphasis omitted)); *United States v. White Eagle*,

721 F.3d 1108, 1122 (9th Cir. 2013) (holding that where a loan is obtained by a bribe, "its value will typically be the difference between the actual cost of the loan, and the cost of the same loan at fair market terms and conditions"); *see also* 18 U.S.C. § 641 (defining "value" for purposes of the federal embezzlement statute to include "face, par, or market value, or *cost price*, either wholesale or retail" (emphasis added)).

Thus, "[a]lthough a jury may consider the value of a bribe *as evidence* of the value of the relevant *quo*," the Fourth Circuit emphasized that the jury "must still find that the value of the *quo* itself exceeds $5,000." *Lindberg*, 39 F.4th at 175 (emphasis in original). "And," the Fourth Circuit continued, "a jury would, therefore, weigh whether an alleged bribe provides evidence of the value of the *quo*, including approaching a seeming mismatch with skepticism." *Id.*

For those reasons, Mr. Lindberg proposed a neutral instruction that provided the jury with a variety of methods to determine whether the subject matter of the alleged bribe exceeded $5,000 or more, including the methodology preferred by the government and the defense:

> You may utilize a variety of methods to determine the value of the subject matter of the alleged bribe. One way to determine its value is to consider what it would cost the government to perform the subject matter of the alleged bribe. Another approach would be to determine what someone would pay on the open market for the subject matter of the alleged bribe if it were available for purchase. In the end, though, you must determine whether the value of the subject matter of the alleged bribe itself was $5,000 or more. Thus, although you may consider the value of the alleged bribe as evidence of the value of the subject matter of the alleged bribe, you still must find that the value of the subject matter of the alleged bribe itself was $5,000 or more. And in doing so, you may consider with skepticism a mismatch between the value of the bribe and the cost of the alleged subject matter of the bribe.

Dkt. No. 416, at 78 (Defs.' Proposed Jury Instructions); *accord* Dkt. No. 433-1, at 17 (proposing the same language as a revision to the Court's initial proposed jury instructions); *see also* Day 5 Rough Tr. 42:6-20 (explaining the basis for the Defendants' proposed instruction).

Over Mr. Lindberg's objection, the Court rejected this proposal. Day 5 Rough Tr. 39:3-6, 42:21-44:24; Day 6 Rough Tr. 57:3-21. Thus, in its final instructions, the Court included only one method for the jury to value the subject matter of the alleged bribe—a method that benefitted only the government:

> To convict on Count 2, you must find that the value of the business, transaction, or series of transactions at issue was $5,000 or more. Although *you may consider the value of the alleged bribe as evidence of the value of the business, transaction, or series of transactions*, you must still find the value of the business, transaction, or series of transactions itself exceeded $5,000, and you may use any evidence in the case in determining value.

Day 7 Rough Tr. 101:14-21 (punctation and emphasis added). This was error.

Mr. Lindberg's proposed instruction was an accurate statement of the law. As noted above, the Fourth Circuit emphasized that, where the business at issue is intangible, courts have relied on "a variety of valuation methods." *Lindberg*, 39 F.4th a 174. Also as noted above, cost is an acceptable method of determining value. Moreover, Section 666 is "silent as to the identity of the person or entity to whom the [subject matter of the alleged bribe] must have at least a $5,000 value." *Foley*, 73 F.3d at 489. Thus, it is fair game to look to the entity providing the subject matter of the alleged bribe when ascertaining its value. That is precisely what Mr. Lindberg requested here.

37

It also was critical to inform the jury in neutral terms on the various ways to value the subject matter of the alleged bribe, and Mr. Lindberg's request was not covered by the Court's remaining instructions. Although Mr. Lindberg's counsel was free to argue that the jury could look to the nonexistent cost to the government of the requested transfer, and the absence of any evidence of a guaranteed benefit to Mr. Lindberg or his companies, the Defense could not point to the Court's instructions to substantiate their claims. In contrast, the government was able to point to the Court's instructions to claim their valuation method was superior to the Defense's: "The Judge is going to give you some supplementary instructions on what that means, and he'll say you may consider the value of the alleged bribe as evidence of the value of the business, transaction, or series of transactions." Day 7 Rough Tr. 18:7-11.

> ### 2. The Court's stated basis for declining to add the Defense's alternative valuation method misapprehended the Fourth Circuit's prior decision in this case.

In declining to instruct the jury on the Defendants' alternative valuation method, the Court suggested that it was simply following the Fourth Circuit's decision in the prior appeal in this case: "[W]hatever the Fourth Circuit says that I need to do, I'll do, but beyond that, I'm not going to do it." Day 5 Rough Tr. 44:5-7. And it is true that, in discussing the "variety of valuation methods" that some courts had applied, the Fourth Circuit did not expressly discuss a cost-based approach. *Lindberg*, 39 F.4th at 174-75. But that is a byproduct of the posture of the prior appeal, not because the Fourth Circuit rejected a cost-based approach as an acceptable method of valuation.

38

In discussing the various methods for valuing the subject matter of the alleged bribe, the Fourth Circuit was responding to a very specific argument raised by the Defendants—that the court of appeals should read an "official act" as a gloss on Section 666 because a "broad reading" of that statute "'could cast a pall of potential prosecution' over legitimate interactions between 'conscientious public officials' and 'citizens with legitimate concerns.'" *Lindberg*, 39 F.4th at 171 (quoting *McDonnell*, 136 S. Ct. at 2355). It was in this context that the Fourth Circuit discussed the $5,000 threshold and the market approach—because that approach risks stripping the $5,000 threshold of independent significance:

> Thus, defendants protest that the $5,000 provision does not meaningfully limit § 666 because under the "market approach" a constituent who legally donates $5,000 or more to an official's campaign could find [himself] liable for *anything* that official does in exchange. But this argument oversimplifies the analytical steps underlying the "market approach." Although a jury may consider the value of a bribe *as evidence* of the value of the relevant *quo*, they must still find that the value of the *quo* itself exceeds $5,000. And a jury would, therefore, weigh whether an alleged bribe provides evidence of the value of the *quo*, including approaching a seeming mismatch with skepticism.

*Id.* at 174-75 (emphasis in original).

In short, the Fourth Circuit was not suggesting that a cost-based approach is illegitimate; it was not even endeavoring to survey the landscape of valuation methodologies. Rather, the court of appeals was explaining that the $5,000 threshold had real teeth because a market-approach was just *one form of evidence* of the value of the subject matter of the alleged bribe. *Id.* at 175.

If anything, the Fourth Circuit's discussion shows why this Court was required to instruct the jury on alternative methodologies—to ensure that the jury could

39

consider with skepticism the massive discrepancy in this case between the $ 2 million in contributions that the Defendants promised and the absence of evidence of any guaranteed financial benefit associated with switching the work from Ms. Obusek to Ms. Walker. Day 6 Rough Tr. 25:7-9 (Ms. Walker) (testifying there was no type of guaranteed financial benefit that would come from her looking over these files instead of Ms. Obusek); *see also* Day 4 Rough Tr. 232:12-233:4 (Special Agent Granozio) (conceding the government had no evidence of the same); *id.* 28:4-8 (Commissioner Causey) (conceding there was "no evidence" that "Debbie Walker ever promised Greg Lindberg or GBIG a guaranteed benefit").

### 3. The error was not harmless.

The Court's error in declining to instruct the jury on a cost-based valuation methodology was not harmless. The absence of a guaranteed benefit of $5,000 and evidence that the proposed switch would have cost the Department of Insurance nothing to implement were central components of Mr. Lindberg's defense. Mr. Lindberg's counsel elicited testimony to this effect from Ms. Walker. Day 6 Rough Tr. 24:18-25:9. And Mr. Lindberg's counsel attempted to argue these points to the jury. Day 7 Rough Tr. 49:25-50:3, 45:12-24. But whereas the government could invoke this Court's instructions to provide legitimacy to its proposed valuation method, *see id.* at 18:7-11, Mr. Lindberg's counsel could not. And given that this was a hard-fought case that could have gone either way, the government cannot show that the failure to give Mr. Lindberg's proposed instruction was harmless.

### D.   The Court erred by admitting two e-mails containing an evolving list of to-do items and notes that Mr. Lindberg maintained that had no additional probative value and posed a substantial risk of unfair prejudice.

Finally, this Court erred when, over Mr. Lindberg's objection, it admitted two e-mails containing an evolving list of to-do items and notes that Mr. Lindberg maintained. Gov't Exhs. 99 & 100; *see also* Day 4 Rough Tr. 146:25-148:23, 194:15-205:17. These e-mails had no additional probative value and posed a substantial risk of unfair prejudice. The government then exploited this error by making these e-mails the capstone of its rebuttal argument to the jury. *See* Day 7 Rough Tr. 81:19-82:9. Under the circumstances, the erroneous admission of these e-mails was not harmless.

### 1.   The e-mails were of limited to no probative value and posed a substantial risk of unfair prejudice.

The two e-mails at issue were similar in several key respects. The first was sent on August 14, 2018, from Mr. Lindberg's account at Eli Global to himself. *See* Gov't Exh. 99 (as tendered without court-ordered redactions). The second was sent on September 1, 2018, in identical fashion. *See* Gov't Exh. 100 (as tendered without court-ordered redactions). Both e-mails were produced by Eli Global in response to a subpoena from the government. *See* Day 4 Rough Tr. 206:8-10; *see also* Gov't Exhs. 99 & 100 (bearing ELI Bates stamps and including e-mails to Mr. Lindberg's account at Eli Global). Both bore a header claiming "attorney client" privilege, Gov't Exh. 99 & 100, and both included limited redactions by counsel based on privilege, *see id.* (including pre-existing redactions as produced by Eli Gobal before the Court ordered additional redactions).

41

The e-mails included a long list of "[t]ransformational action items," including Mr. Lindberg's aspiration goals about his net worth in 2041 and a few inspirational quotes under his "2020 Vision" for himself. Gov't Exhs. 99 & 100 (as tendered without court-ordered redactions). The e-mails also contain a list of to-do items and notes in an entirely different section. *See id.*

Notably, there are significant revisions to the to-do items and notes between the two e-mails, which show that these e-mails were intended as a working document. For example, the August 14, 2018, e-mail shows just a half page of notes and to-do items under "#1:" before "UW TOP LEVEL." Gov't Exh. 99, at 2 (as tendered without court-ordered redactions). In contrast, the September 1, 2018, e-mail shows two-and-a-half pages of notes and action items added under "#1:" before "UW TOP LEVEL." Gov't Exh. 100, at 2-4 (as tendered without court-ordered redactions). As another example, there is an entirely different list and set of action items under the header: "CASH PLAN MASTER." *Compare* Gov't Exh. 99, at 4-5 (as tendered without court-ordered redactions), *with* Gov't Exh. 100, at 7-9 (as tendered without court-ordered redactions). Thus, the e-mails were not identical but an evolving list of notes.

According to the government, the most notable change Mr. Lindberg made to these e-mails involved two near-identical entries that evolved over time:

August 14, 2018:    * refund the $1.5M from the 501c4 and 527 if no redom approval and DW in place by 8-31-18

Gov't Exh. 99, at 3.

September 1, 2018:    * refund the $1.5M from the 501c4 and 527

Gov't Exh. 100, at 5.

There was no evidence that this evolving entry showed an intent on Mr. Lindberg's part to obstruct the government's investigation. Indeed, the government received both e-mails from Eli Global; the August 14 e-mail was not deleted from any server.

There also is a benign reason for the change: The first e-mail, written on August 14, 2018, reminded Mr. Lindberg to refund the money if certain events did not occur by August 31, 2018, and the second e-mail, written on September 1, 2018—*i.e.*, after August 31, 2018—removed the condition because those events had not occurred. *See* Gov't Exhs. 99 & 100.

Nevertheless, in seeking to admit these e-mails, the government argued that the FBI interviewed Mr. Lindberg between August 14 and September 1, 2018, and the change in the e-mails therefore revealed an acknowledgement on Mr. Lindberg's part that "there's a problem with" his request to put "DW"—*i.e.*, Debbie Walker—in place. Day 4 Rough Tr. 148:10-16. Yet, as Mr. Lindberg's counsel noted in opposition, that theory was "complete speculation." *Id.* at 148:21-23.

These e-mails therefore had limited to no probative value, and they did not provide the jury with any new information that it did not have from sources untainted by the risk of substantial unfair prejudice. The Defendants did not dispute that there was a *quid pro quo* of $1.5 million in contributions to two independent expenditure committees in exchange for reassigning work from Ms. Obusek to Ms. Walker. Thus, the need to admit these e-mails was particularly weak. *See id.* at 199:21-22 (Def. Counsel) (noting that the information was "cumulative"); *accord Carnell Constr.*

43

*Corp. v. Danville Redev. & Housing Auth.*, 745 F.3d 703, 719 (4th Cir. 2014) (explaining that "the trial court must assess the proponent's need for admission of the evidence in the full evidentiary context of the case" (citing *Old Chief*, 519 U.S. at 184-85)); *see also Ham*, 998 F.2d at 1253 (holding that even if evidence has some probative value, the district court should have assessed "the incremental probative value" in light of the rest of the evidence that was available to the government).

In contrast, the risk of unfair prejudice was substantial, and the government exploited that risk in three significant ways:

First, the last thing the government told the jury was that the two versions of the e-mail showed an intent on Mr. Lindberg's part to obstruct the government's investigation—"[h]iding the evidence"—and, therefore, proved "[c]onsciousness of guilt." Day 7 Rough Tr. 82:8-9; *see also* Day 4 Rough Tr. 210:2-212:23. That was rank speculation on the government's part, and it was highly prejudicial. As noted above, there is a benign reason for the revision, and other changes were made to the second e-mail showing the evolving nature of Mr. Lindberg's notes and to-do items. Nor was there any evidence that Mr. Lindberg was attempting to hide evidence—such as deleting documents from a server. Just the opposite, Mr. Lindberg's company preserved and produced both e-mails to the government.

Second, the government suggested to the jury that there was something nefarious about Mr. Lindberg's invocation of the attorney-client privilege at the top of the e-mail, because the e-mail was sent from Mr. Lindberg to himself, and no lawyers were copied on the e-mail. *See* Day 4 Rough Tr. 206:16-24. A communication

to or from counsel does not lose its privileged status merely because it is relayed from one non-lawyer to another who has a legal reason to know its contents. *F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64, 71 (D. Md. 1998); *Santrade, LTD. v. General Electric Co.*, 150 F.R.D. 539, 543 (E.D.N.C. 1993) ("A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds."). It therefore follows that a privileged communication does not lose that status merely because a client recounts it in confidential notes that he keeps for himself. *See United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002) ("Materials . . . that reflect matters about which the client intends to seek legal advice are comparable to notes a client would make to prepare for a meeting with her lawyer . . . It would undermine the purpose of the attorney-client privilege not to extend protection to such notes."). Critically, the e-mails at issue here were redacted by counsel before Eli Global produced them to the government, and the government never challenged these designations, all of which supports Mr. Lindberg's invocation of privilege over the contents of these e-mails. *See* Gov't Exhs. 99 & 100 (including pre-existing redactions as tendered by Eli Global). Thus, the government's negative insinuations about Mr. Lindberg's use of an "attorney-client" label were baseless and unfairly prejudicial.

Finally, the government argued and elicited testimony from Special Agent Granozio that the e-mails showed motive and intent on Mr. Lindberg's part because they included aspirational goals related to Mr. Lindberg's net worth by 2041 and an inspirational quote that Mr. Lindberg was "aggressively demanding on procedures to

avoid surprises." Day 4 Rough Tr. 207:3-208:7. The implication was that Mr. Lindberg had a financial motive in 2041 that was somehow connected to his request to reassign work from Ms. Obusek to Ms. Walker and that his inspirational quote showed he was responsible for the request, not relying on the advice of others. *See id.* at 195:25-196:19, 198:4-9. There was no support for any connection between these statements and Mr. Lindberg's request to shift work to Ms. Walker, which appeared in an entirely different section of the e-mails. *See* Gov't Exhs. 99 & 100. As such, the introduction of evidence of Mr. Lindberg's aspirations for growing his wealth served only as an appeal to "class prejudice" and was therefore "highly improper." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239 (1940).

The redactions did nothing to cure the prejudice and, in fact, made it worse. Because the two e-mails were heavily redacted, the government could imply that they were virtually identical, which allowed the government to suggest, falsely, that Mr. Lindberg was merely "resend[ing]" the same e-mail to himself—but only after deleting "the quo." Day 7 Rough Tr. 82:5-7. In reality, the documents show that Mr. Lindberg was engaged in an iterative process of revising his notes, which negates any suggestion that he made revisions with nefarious intent. The redactions also removed section headers and other separators, *see* Gov't Exhs. 99 & 100, allowing the government to imply, falsely, that the unredacted items were somehow linked. As a result, the jury was misled to believe that Mr. Lindberg's aspirations about his net worth in 2041 were somehow tied to changing Ms. Walker for Ms. Obusek. Day 7 Rough Tr. 81:20-25. This, too, was highly and unfairly prejudicial.

### 2.    The error in admitting these e-mails was not harmless.

The erroneous admission of these e-mails, even in redacted form, was not harmless. As noted above, the government made a series of false and unfairly prejudicial arguments based on these e-mails, and it timed these arguments for maximum effect—at the end of the government's rebuttal argument, depriving the defense of any opportunity to respond. Given the close nature of this case, and the nature of the Defendants' principal defense, which went to a lack of criminal intent, the government used these e-mails to argue, without any basis, that they showed an intent on Mr. Lindberg's part to obstruct the government's investigation ("[h]iding the evidence"), and they proved "[c]onsciousness of guilt." Day 7 Rough Tr. 82:8-9.

* * *

Any of these instructional or evidentiary errors is sufficient to warrant a new trial. But when viewed collectively, the need for a new trial is overwhelming.

## CONCLUSION

Mr. Lindberg respectfully requests that the Court enter a judgment of acquittal or, alternatively, order a new trial on both counts.

Dated: May 29, 2024

Respectfully Submitted,

/s/ James F. Wyatt, III

Robert T. Smith (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006
202-625-3500
robert.smith1@katten.com

James F. Wyatt, III
  (NC State Bar No. 13766)
Robert A. Blake, Jr.
  (NC State Bar No. 20858)
WYATT & BLAKE, LLP
402 W. Trade Street, Suite 101
Charlotte, NC 28202
704-331-0767
704-331-0773 (fax)
jwyatt@wyattlaw.net
rblake@wyattlaw.net

Brandon N. McCarthy (*pro hac vice*)
Rachel M. Riley (*pro hac vice*)
KATTEN MUCHIN ROSENMAN LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201-2591
214-765-3600
brandon.mccarthy@katten.com
rachel.riley@katten.com

*Counsel for Defendant Greg E. Lindberg*

48